IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

PARKERSBURG

RANDY WAYNE BOYCE,

       Plaintiff,

v.                                 CASE NO. 6:09-cv-01107

MICHAEL J. ASTRUE,
Commissioner of Social Security,

       Defendant.

## PROPOSED FINDINGS AND RECOMMENDATION

This is an action seeking review of the final decision of the Commissioner of Social Security denying the Claimant's application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383f.  This case was referred to this United States Magistrate Judge by standing order to consider the pleadings and evidence, and to submit proposed findings of fact and recommendation for disposition, all pursuant to 28 U.S.C. § 636(b)(1)(B).

Plaintiff, Randy Wayne Boyce (hereinafter referred to as "Claimant"), filed an application for SSI on November 1, 2006, alleging disability as of September 1, 2005, due to attention deficit hyperactivity disorder ("ADHD"). (Tr. at 8, 104-110, 147-51, 155-60.)  The claim was denied initially and upon reconsideration. (Tr. at 8, 52-54, 58-60.)  On April 20, 2007, Claimant requested a hearing before an Administrative Law Judge

("ALJ").  (Tr. at 62.)  The hearing was held on January 23, 2009 before the Honorable Rossana L. D'Alessio.  (Tr. at 8-23, 71-75.) By decision dated February 6, 2009, the ALJ determined that Claimant was not entitled to benefits.  (Tr. at 8-23.)  The ALJ's decision became the final decision of the Commissioner on August 11, 2009, when the Appeals Council denied Claimant's request for review.  (Tr. at 1-4.)  On October 9, 2009, Claimant brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g).

A child is disabled under the Social Security Act if he or she "has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 1382c(a)(3)(C)(I).  Under the regulations in force during all times relevant to Claimant's claim, the ALJ must determine whether the child is engaged in substantial gainful activity.  20 C.F.R. § 416.924(b) (2006).  If the child is, he or she is found not disabled.  Id. § 416.924(a).  If the child is not, the second inquiry is whether the child has a severe impairment. Id. § 416.924(c).  An impairment is not severe if it constitutes a "slight abnormality or a combination of slight abnormalities that causes no more than minimal functional limitations."  Id.  If a severe impairment is present, the third and final inquiry is

2

whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. § 416.924(d). If the claimant's impairment meets or functionally equals the requirements of Appendix 1, the claimant is found disabled and is awarded benefits. Id. § 416.924(d)(1). If it does not, the claimant is found not disabled. Id. § 416.924(d)(2).

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(I), an adult claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 1382c(a)(3)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. § 416.920 (2002). If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. § 416.920(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. § 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. § 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment

3

meets or equals any of the impairments listed in Appendix 1 to
Subpart P of the Administrative Regulations No. 4.    Id. §
416.920(d).  If it does, the claimant is found disabled and awarded
benefits.  Id.  If it does not, the fourth inquiry is whether the
claimant's impairments prevent the performance of past relevant
work.  Id. § 416.920(e).  By satisfying inquiry four, the claimant
establishes a prima facie case of disability.  Hall v. Harris, 658
F.2d 260, 264 (4th Cir. 1981).  The burden then shifts to the
Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir.
1983), and leads to the fifth and final inquiry: whether the
claimant is able to perform other forms of substantial gainful
activity, considering claimant's remaining physical and mental
capacities and claimant's age, education and prior work experience.
20 C.F.R. § 416.920(f) (2002).  The Commissioner must show two
things: (1) that the claimant, considering claimant's age,
education, work experience, skills and physical shortcomings, has
the capacity to perform an alternative job, and (2) that this
specific job exists in the national economy.    McLamore v.
Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

Claimant was sixteen years old when he filed his application
for benefits and eighteen years old at the time of the ALJ's
Decision.  For the time period prior to attaining age eighteen, the
ALJ evaluated Claimant's claims under the regulations governing the
determination of disability for children.  See 20 C.F.R. §416.924

4

(setting forth procedures for determining disability for children).
For the time period as of attaining age eighteen, the ALJ evaluated
Claimant's claims under the regulations for determining disability
for adults.  See 20 C.F.R. §416.920 (setting forth procedures for
determining disability for adults).

In this particular case, the ALJ determined that Claimant, who
was in the "Adolescents" (age 12 to attainment of age 18) age group
on November 1, 2006, the date the application was filed, satisfied
the first inquiry because he has not engaged in substantial gainful
activity since the date the application was filed (Claimant
attained age 18 on August 22, 2008).  (Tr. at 12.)  Under the
second inquiry, the ALJ found that Claimant, before attaining age
18, suffered from the severe impairment of ADHD. (Tr. at 13.)  At
the third inquiry, the ALJ concluded that before attaining age 18,
Claimant's impairment did not meet or equal the level of severity
of any listing in Appendix 1.  (Tr. at 13-18.) The ALJ found that
Claimant had not developed any new impairment or impairments since
attaining age 18.  (Tr. at 18-19.)  The ALJ then found that
Claimant has a residual functional capacity to perform a full range
of work at all exertional levels, reduced by nonexertional
limitations. (Tr. at 19-21.)  Claimant has no past relevant work.
(Tr. at 21.)  The ALJ concluded that Claimant could perform jobs
such as laundry worker, hand packager, and cafeteria worker which
exist in significant numbers in the national economy. (Tr. at 22.)

On this basis, benefits were denied.  (Tr. at 23.)

<u>Scope of Review</u>

The sole issue before this court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence.  In <u>Blalock v. Richardson</u>, substantial evidence was defined as

> "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'"

<u>Blalock v. Richardson</u>, 483 F.2d 773, 776 (4th Cir. 1972) (quoting <u>Laws v. Celebrezze</u>, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the court, is charged with resolving conflicts in the evidence.  <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990).  Nevertheless, the courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational."  <u>Oppenheim v. Finch</u>, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is supported by substantial evidence.

<u>Claimant's Background</u>

Claimant was eighteen years old at the time of the administrative hearing.  (Tr. at 29.)  He was in the eleventh grade

of high school and had been retained in kindergarten, seventh, eighth, and ninth grades. (Tr. at 30.) He is in special education classes for math and English. (Tr. at 31.) Claimant has no past work experience. (Tr. at 46.)

<u>The Medical Record</u>

The court has reviewed all evidence of record, including the medical evidence of record, and will summarize it below.

On June 21, 2000, Nancy Rabel Canterbury, M.A., Clinical Psychologist, provided a psychological evaluation of Claimant for Wood County Schools to determine if Claimant qualified for special education services. (Tr. at 241-42.) She described Claimant as "cheerful and cooperative" with good "motivation and effort" during Weschler Intelligence Scale for Children-III (WISC-III)testing which revealed: "Verbal IQ - 87 (19 percentile); Performance IQ - 93 (32 percentile); Full Scale IQ - 88 (21 percentile); Classification: Low Average." (Tr. at 242.) Ms. Canterbury recommended: "Continue with classroom modifications which include involvement in the remedial reading program, using preferential seating to reduce distractions, shortening assignments as needed, repeating instructions and checking for clarity before leaving him to work independently, providing positive praise for completing work, and using academic material on his level." (<u>Id</u>.)

Wood County School records indicate Claimant began eighth grade on August 26, 2005. His first semester grade point average

7

("GPA") was 2.125 with one absence. (Tr. at 209.)  His second semester GPA was 2.125 with one absence.  (Tr. at 208.) His third semester GPA was 2.125 with no absences.  (Tr. at 207.) His fourth semester GPA (dated June 7, 2005) was .500 with twenty-eight and a half absences.  (Tr. at 210.)  Comments state: "Retained in current grade for next school year. Excessive class absence is affecting work.  Not working up to capability.  Work missed and not made up. Does poorly on quizzes and tests.  Fails to do class work and/or homework."  (Id.)

On May 15, 2006, Claimant, an eighth grader, took the West Virginia Educational Standards Test (WESTEST).  (Tr. at 201.) His scale score ranges indicated he had "Partial Mastery" in all tested subjects: Mathematics, Reading/Language Arts, Science, Social Studies.  (Id.)

On May 19, 2006, Joni L. Eddy, a Wood County Schools Individual Multidisciplinary Team Member, reported: "The purpose of this evaluation is to determine if Randy is eligible for Special Education services... Adaptive Behavior Evaluation Scale... [indicates] Strengths - Randy is strong in self care. Weaknesses - Randy appears to have a weakness in self-direction and social interaction." (Tr. at 179, 214.)

On May 22, 2006, Ms. Eddy reported in an observation report for Wood County Schools that Claimant "gave up easily... distractable...short attention span." (Tr. at 180, 215.) She

8

observed Claimant in two classroom settings and noted:

> Setting - Science: Randy is not paying attention, he is
> tapping on his desk and playing with his pen.  A video is
> now playing and it has captured Randy's interest.  He is
> becoming focused - stays focused for 10 minutes.  Cars
> drive by and he is now staring out the window.  After
> being prompted, he is back on track.
>
> Setting - English: Randy came prepared with his journal
> entries.  He stayed on task and appeared to take in
> today's lesson.  After given an assignment, Randy seemed
> confused and needed directions restated.  After
> clarification, he worked on his assignments.

(Id.)

On June 1, 2006, Wood County Schools Eligibility Committee
Members filled out a form stating that Claimant's "primary area of
exceptionality is: Mentally Impaired (MI)."  (Tr. at 177, 212.)
The form checked a box indicating "Yes" to the following statement:
"The student needs or continues to need specially designed
instruction." (Id.)

On September 26, 2006, Derek Snyder, Westbrook Health
Services, performed an intake evaluation of Claimant.  (Tr. at 181-
83.) He reported that Claimant had no psychiatric and behavioral
health treatment history.  (Tr. at 181.) He stated:

> **Presenting Problems**: Randy was brought in today by his
> guardian, Cherie Shields.  Randy has been residing with
> Mrs. Shields since August 9, 2006.  His biological
> mother, Karla Turner (48), gave up custody of Randy.  It
> was reported that Ms. Turner wasn't at home very much.
> Because of this, Randy spent a lot of his time at the
> home of Terry Shields, daughter of Cherie Shields where
> Randy now resides.  CPS is currently involved...It was
> also reported that Randy has been having problems in
> school.  He reported behaviors/symptoms characteristic of
> ADHD...He reported being in special education classes

last year but is currently in regular education classes this year. Randy also reported, "All I got to do is make a D and I pass." Teacher reports indicate that Randy has difficulty with reading comprehension. WESTEST scores indicate Randy scored in the "Partial Mastery" in all areas with the lowest score coming in the category of Reading/Language Arts. Mrs. Shields reported that Randy has behaved very well since moving in with her and her husband in August...

**Brief Social/Family History**: Randy (16) currently lives with Cherie (63) and William (62) Shields... Randy's biological mother, Karla Turner (48), lives in Parkersburg and was reported as being "deaf." It was also reported that she is having problems with alcohol. Mrs. Shields had concerns regarding possible Fetal Alcohol Syndrome with Randy. Randy's biological father, Darrel Boyce (48)passed away in January 2005 when he was trapped inside of a home that burned down. It was reported that alcohol may have been involved in that accident. Randy also reported that he has a half-sister who recently graduated from Parkersburg High School...

**Mental Status**: Randy is a 16 year old male who looks his stated age. Today his mood and affect were both appropriate as was his appearance. His speech was somewhat slurred. Towards the endo of the intake it should be noted that Randy became rather bored and restless. He was oriented in all spheres. He could repeat sequences of 5 and 6 numbers. He was unable to recall 4 words of a several minutes time lapse. His judgment was not impaired. When asked what his three wishes would be, Randy replied, "an X-Box." When asked what he wanted to be when he grew up, Randy replied, "I don't know yet." Suicidal and homicidal ideations were denied.

**Strengths**: Fishing, video games, athletic

**Weaknesses**: School

**Diagnosis**:
Axis I     314.01 ADHD, combined type
           V61.21 Parent-Child Relational Problem
           R/O 315.00 Reading Disorder
Axis II    Mild Mental Impairment
Axis III   none reported
Axis IV    stressors from death of biological father,

little contact with biological mother
Axis V    55 currently

Discussion: Randy also presented some symptoms of depression including a depressed mood, loss of interest in previously enjoyed activities, lack of concentration, and increased sleep. While not enough criteria were met for a valid diagnosis of depression, these symptoms should be looked into further during therapy sessions. Also, because of concern expressed by Mrs. Shields and the history of alcoholism in the biological mother, the possibility of Fetal Alcohol Syndrome should be considered as well.

**Treatment Recommendations**: Randy will receive case management services from a case manager who is yet to be determined and therapy services from Sue Lamp. Psychiatric services will be started when time is available. He will be an active participant in all treatment sessions.

(Tr. at 181-82.)

On October 9, 2006, Wood County Schools evaluated Claimant for an "Individualized Education Program." (Tr. at 184-93.) Evaluations indicated that Claimant should be receiving "90% of his classes in a regular education environment, 10% Special Education Environment." (Tr. at 192.) Jane R. Padden, Special Education Teacher/Provider stated:

Formal/informal testing indicate deficits in all academic areas. Relative strengths were noted in Math Calculations and Applied Problems. Woodcock-Johnson III (10/05) reveals that Randy is significantly below average in Reading Comprehension, Written Expression, and Academic Application. Randy is currently in all regular education classes and is passing all except one. This is with major modifications being made by the regular ed teachers. Randy has been reluctant to work in the special education classroom for fear of being "different" from his friends. Randy needs assistance in a small group/ 1 to 1 setting on organizational skills to assist him in work in the regular ed classroom. He has

11

difficulty completing homework assignments, staying focused in class, completing class work in the allotted time.

(Tr. at 185.)

On December 11, 2006, Joseph A. Shaver, Ph. D., completed a Childhood Disability Evaluation of Claimant. (Tr. at 217-22.) He concluded: "Impairment or combination of impairments is severe, but does not meet, medically equal, or functionally equal the listings." (Tr. at 217.) He concluded that Claimant's degree of limitation was "less than marked" in the areas of acquiring and using information, attending and completing tasks, interacting and relating with others, and caring for yourself. (Tr. at 219-220.) He found Claimant had no limitation in moving about and manipulating objects. (Tr. at 220.) Dr. Shaver noted:

> Claimant's FS [Full Scale] IQ of 73 falls into the borderline impaired category. However, his WISC IV profile contained considerable variability with scores ranging from mildly impaired to average... Psychoed evaluation indicates that Claimant was cooperative, quiet and polite... Claimant's overall adaptive behavior skills fell into the above average category (Adaptive Quotient=109).

(Tr. at 219.)

In an explanation of his findings, Dr. Shaver stated that Claimant had "good comprehension, quiet but polite, sat patiently during the one hour interview and played with his mini Nintendo game and that occupied his full attention... Child's daily activities are not limited. Has problems understanding and using what he has learned. Has problems paying attention and sticking

12

with task." (Tr. at 222.)

On March 5, 2007, Philip E. Comer, Ph. D., completed a Childhood Disability Evaluation of Claimant. (Tr. at 223-28.) He concluded: "Impairment or combination of impairments is severe, but does not meet, medically equal, or functionally equal the listings." (Tr. at 223.) He concluded that Claimant's degree of limitation was "less than marked" in the areas of acquiring and using information, attending and completing tasks, interacting and relating with others, and caring for yourself. (Tr. at 225-26.) He found Claimant had no limitation in moving about and manipulating objects. (Tr. at 226.) Dr. Comer noted: "Problems are mainly failure to complete assignment and poor attitude... Child's behavior and interactions during CE were reported as polite and cooperative...Child's overall self care capacity appears adequate. TL does report a serious problem with asking for help and an obvious problem with self calming." (Tr. at 225-26.) Dr. Comer concluded: "Child's diagnoses and concomitant limitations do not meet or equal listings. He appears to be making adequate progress in school." (Tr. at 228.)

On July 26, 2007, David A. Snider, Ed. S., West Virginia Certified School Psychologist, Wood County Schools, evaluated Claimant "to monitor his progress in the MMI program and to help determine his educational needs" as he transitions from junior high school (ninth grade) to high school (tenth grade). (Tr. at 239-40,

13

244-49.) He stated:

> Although Randy has made progress, while in the MMI
> program, his final grades show that he still continues to
> struggle academically, and may continue to need support
> to assure his academic progress. Randy previously
> received Special Education Services from 11/15/93 to
> 06/05/96, as a Preschool Special Needs student. Later,
> during June & July 2000, Randy tested for possible LD or
> MI, but did not qualify for services. He did, however,
> qualify for speech services, which he received from
> 07/17/00 to 05/28/03. More recently, Randy was tested on
> 12/07/05, but again did not qualify for Special Ed
> services when the Eligibility Committee (EC) met on
> 01/10/06; however, it was agreed that Randy's academic
> progress would continue to be monitored for the remainder
> of the school year; and that the S.A.T. would reconvene
> in May to determine if Randy needed to be re-referred to
> the EC. At that time (i.e. in May of 2006) additional
> data was collected, and the EC met again on 06/01/06, and
> determined that Randy would be eligible for Special
> Education services as an MMI student...
>
> Randy's final grades for the 2006-2007 school year were
> as follows: Intro Major - B; Health - F; Work Base - A;
> Phys Ed - B; English/LA [language arts] - C; US to 1900
> [history] - D; Algebra/Geometry/PRP - C; Gen CMPT App -
> D; CATS 9 - C.

(Tr. at 239-40.)

Mr. Snider tested Claimant's IQ with the Stanford-Binet
Intelligence Scales, Fifth Edition (SB5), and found his Full Scale
IQ (FSIQ) to be 90 (Nonverbal IQ 93, Verbal IQ 87, Fluid Reasoning
100, Knowledge 80, Quantitative Reasoning 78, Visual-Spatial
Processing 97, Working Memory 103), an overall intellectual ability
classified as being within the low average to average range. (Tr.
at 245-46.)

On September 12, 2007, John Kelley, M.D., Psychiatrist,
Westbrook Health Services, reported:

14

Randy arrived today with his guardian and has done fairly
well during the summer.  Now school has started and he's
back into some of the same situations meaning that there
are subjects that he likes and subjects in which he feels
bored.  When he feels bored he tends to do less work and
these could be problems.  Currently classes in which he's
lost interest appear to be art, English, and a class
called transportation that relates to everyday practical
life work such as doing a budget, keeping a checkbook,
etc. etc.

**DIAGNOSIS:**
Axis I       ADHD, Combined Type, 314.01
             Parent/Child Relational Problem, Mild. V61.20
Axis II      Reading Learning Disability
             Evidence of Borderline to Mild Mental
             Retardation
Axis III     Wears Glasses
             Dental Braces

Rest of diagnoses are as stated before.

**DISCUSSION:** He'll continue on Adderall 10 mg q a.m.
although in the future there might be a slight increase.
Adderall at the level of 15 mg gave him a great deal of
difficulty sleeping.  At the moment he doesn't really
want a trial of any small amount after school to help
with homework.  He'll return in two to three months.

(Tr. at 229.)

On November 28, 2007, Dr. Kelley reported in a progress note:

Randy arrived today with his guardian as we checked on
his ADHD, academic achievements, general behavior, and
needs for appropriate medication.  As it turns out, his
GPA was 0.486 which showed no A's and B's, five F's and
the rest D's or C's.  The five F's were in math, English,
U.S. history, art, and health.  Clearly, he is not
concentrating well, not staying on his work, and has poor
motivation.  Initially the guardian had started him
fairly early on 20 mg and on that particular day he had
severe difficulty sleeping so he went down to 10 and has
not increased his total daily dosage to above Adderall XR
10 mg 1 a.m.  Therefore we're stuck in the situation with
a boy who clearly is not concentrating well, does respond
to Adderall, but the side effects have been a
problem...He'll continue the Adderall at 10 mg XR q a.m.

15

although this is not enough.   Therefore we're adding
Strattera 25 mg q a.m. for one week, 40 mg q a.m. the
second week and then both together a total of 65 mg
thereafter with his return in early to mid January.  By
that time we'll be able to tell how well he is doing.

(Tr. at 230.)

On March 26, 2008, Dr. Kelley reported:

His grades remain below a 2.0 and his guardian feels that
this is partly because of his lack of interest and
involvement.  He has had reading learning disability and
evidence of other intellectual difficulties contributing
to his problems.  Now he seems to be unable to adjust
upwards much and feels some boredom in some of the
classes that are more difficult.  He grades have gotten
a little bit better.   He is in the tenth grade now
despite the fact that he is approaching 18.  He does have
some interest in mechanical things and he is in a shop
class in which they are building a carbon dioxide car...
His Adderall continues at 10 mg XR in the morning but
more than that causes significant side effects.
Therefore we started Strattera and had him up to 65 mg a
day.  At his weight he can utilize up to 80 mg which will
be done 40 mg x's two.   Therefore he'll remain on both
medications and return again in about two months.

(Tr. at 231.)

On August 6, 2008, Dr. Kelley reported:

Since the time we first saw him Randy has been somewhat
difficult to interview because he tends to be very quiet
and clearly seems to show evidence of low self esteem.
At the same time he has feature (sic) of Attention
deficient (sic) disorder and difficulty relating to
parental figures although in the case of the Shields they
seem to be handling him quite well and he has made some
major improvements such as this past year in grade (sic)
from straight F's to many good grades as well. However
there are no direct features indicative of psychosis.  We
worried about the possibility of depression given his
flat affect but it appears that this partly grew out [of]
his anxiety, sensitivity, and shyness... He has made a
big improvement, he will return in 2 months.

(Tr. at 232-33.)

16

On September 24, 2008, Dr. Kelley reported:

> Here we have a boy whose self esteem was really dirt low.
> With the help of his custodial family however an
> improvement partially helped by medication Exedra, he is
> making progress and has already made some good grades on
> some of the minor tests that have been given initially in
> school.   Underneath there is no evidence of psychotic
> features.   The improvement in his grades has helped
> improve his self esteem.

(Tr. at 234.)

On December 17, 2008, Dr. Kelley provided a Child Functional Assessment in which he concluded that Claimant had no limitations with "moving about and manipulating objects". (Tr. at 236.) He found that Claimant's limitations were "Less than Marked" in the areas of "acquiring and using information", "interacting and relating to others", "caring for self", and "health and physical well-being", and that his limitations were "Marked" in the area of "attending and completing tasks". (<u>Id</u>.) Dr. Kelley opined that Claimant had no areas in which he was extremely limited. (<u>Id</u>.)

On January 20, 2009, David Snider, Ed.S., Certified School Psychologist, Wood County Schools, wrote a letter addressed "To Whom It May Concern, In regard to Randy W. Boyce" in care of Claimant's representative. (Tr. at 237-38.) This letter states that he has been acquainted with Claimant for four years since testing him at school to see if he qualified for Special Education Services:

> At the time he was struggling a great deal academically,
> and even with considerable support from his regular
> education teachers, it was felt that Randy had a possible

17

Learning Disability.  As it turned out Randy's Full Scale IQ (FSIQ) was within the Mildly Mentally Impaired (MMI) range (i.e. Randy had an obtained FSIQ of 73, per the...WISC-IV, with additional adaptive behavioral issues and academic problems.)  Given the above, Randy was placed within the MMI program (January 2006), where he received Special Education services, in addition to his regular education program.

The above experience led me to become acquainted with Ms. Cherie Shields, who was eventually to become Randy's legal guardian... Randy came from a home environment with limited structure and discipline.  For example, Randy often did not attend school, and was not always made - by his biological mother - to attend school...Randy did not always receive proper meals or nourishment; and when the examiner first met Randy, he appeared rather small for his chronological age - of 15 years old (during December 2005)...

Since living with Ms. Shields, Randy has made considerable progress - both academically and socially.  For example, Randy was reassessed in July 26, 2007, and was found to have a FSIQ of 90 - within the average range (per the Stanford-Binet Intelligence Scales, Fifth Edition (SB5).  In addition to the above IQ having gone up significantly, Randy also appeared to have grown taller, and filled out considerably.

Despite the progress that Randy has made, he still has had a difficult time growing up and maturing...In conclusion, I would like to express my continuing concern, despite the progress that Randy has made during the past three years.  I still feel that although Randy is now considered legally to be an adult, that his social development is considerably delayed; and therefore, he will continue to need some form of residential/home support and perhaps vocational training and job support, after he graduates from High School.  Subjectively, I feel that Mr. and Mrs. Shields have literally and figuratively "saved" Randy from becoming a high school drop out; and therefore a burden on society... It is my hope that all those concerned will continue to do what is in Randy's best interest.

(Tr. at 237-38.)

Claimant's Challenges to the Commissioner's Decision

Claimant asserts that the Commissioner's decision is not supported by substantial evidence because (1) the ALJ failed to develop the record and order a consultative examination; (2) the ALJ erred in her consideration of Claimant's daily activities and medication; and (3) the ALJ failed to give proper weight to the opinion of Claimant's teacher in determining his ability to work. (Pl.'s Br. at 2-7.)

The Commissioner asserts that (1) the ALJ sufficiently developed the record in finding that Claimant was not disabled under the act; (2) the ALJ properly considered Claimant's daily activities and medication; and (3) the ALJ gave proper weight to the opinion of Claimant's teacher. (Def.'s Br. at 3-17.)

Duty to Refer Claimant for a Consultative Examination

Claimant asserts that the ALJ erred when she failed to develop the record when she did not order a consultative examination. Specifically, Claimant argues:

> The ALJ failed to fulfill her duty to develop the record in this case when she failed to order a consultative examination and relied on assessments that were too far removed from the date of the hearing to be assigned significant or great weight. The ALJ relied on a Childhood Disability Evaluation that was completed by a state agency physician in 2006 as well as a Childhood Disability Evaluation form that was filled out in early 2007...

> The evidence relied upon by the ALJ was too far removed from the date of the hearing to be relied upon as controlling. The claimant's attorney specifically asked the ALJ to have the claimant sent out for a Consultative

Examination for this very reason...

The progress notes from Dr. Kelley, in fact, continuously state "he is not concentrating well, not staying on his work, and has poor motivation...does respond to Adderall, but the side effects have been a problem."

(Pl.'s Br. at 2-4.)

The Commissioner responds that Claimant's assertion has no merit because the ALJ sufficiently developed the record in finding that Claimant was not disabled under the act.  Specifically, the Commissioner argues:

Regarding the evidence, Plaintiff appears to contend that the ALJ erred in relying on the reports on Dr. Shaver and Dr. Comer because, in his view, they were dated too early to be relevant to his claim.  Plaintiff is mistaken in this contention.  Dr. Shaver reviewed Plaintiff's claim in December 2006 as part of the state agency's initial determination (Tr. 217-22).  See 20 C.F.R. §404.902 (describing initial determinations generally).  Dr. Shaver's review occurred in December 2006 because that is when Plaintiff's claim progressed to the initial level of review.  Dr. Comer reviewed Plaintiff's claim in March 2007 as part of the state agency's reconsideration determination (Tr. 223-24).  See 20 C.F.R. §404.907 (describing reconsideration determinations generally).  Dr. Comer's review occurred in 2007 because that is when plaintiff's claim progressed to the reconsideration level of review.  Both of these reviews occurred during the relevant time period of Plaintiff's claim.  The relevant time period of Plaintiff's claim was from November 2006, when he applied for SSI, to February 2009, when the ALJ issued her final decision.  Accordingly, both Dr. Shaver's and Dr. Comer's reviews were relevant to the time period of Plaintiff's claim and the ALJ properly considered them...

Plaintiff appears to suggest that the ALJ did not rely on Dr. Kelley's opinions as set forth in his report (Pl. Br. at 3-4).  This is incorrect, as the ALJ gave "great weight" to Dr. Kelley's opinion (Tr. 21).  The ALJ gave great weight to this opinion because it is consistent with the evidence of record...The ALJ noted that Dr.

> Kelley had completed a Child Functional Assessment form... The ALJ's findings regarding Plaintiff's limitations in the six domains is fully consistent with that of Dr. Kelley (Tr. 13-18).
>
> Plaintiff contends that the ALJ erred when she did not arrange for him to undergo a consultative examination (Pl.'s Br. at 4). A consultative examination was not warranted in this case...the ALJ reasonably concluded that this was not a case in which there was an absence of sufficient evidence to determine whether Plaintiff was disabled.

(Def.'s Br. at 12-16.)

In the decision, the ALJ concluded that although Claimant's ability to perform work at all exertional levels has been compromised by nonexertional limitations, Claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy. (Tr. at 23.) In so finding, the ALJ articulated his views as to Claimant's testimony, his medically determinable impairment, and the medical evidence of record:

> [T]he claimant testified that he is able to concentrate to play video games yet he is not able to concentrate on his school work. He admitted that this may be due to boredom. The undersigned notes that the claimant's ability to concentrate on video games is inconsistent with his allegations of disability.
>
> At the hearing, the claimant's attorney requested that the claimant be sent for a consultative psychological evaluation. The undersigned denied this request as the record contains fairly recent IQ scores and the record contains fairly good comprehensive progress notes from Dr. Kelley, the claimant's treating psychiatrist, which shows how the claimant improved on medication and that he is maintaining on the medication.
>
> As for the opinion evidence, on December 11, 2006, Joseph

21

Shaver, Ph.D., a reviewing physician at the state agency, completed a Childhood Disability Evaluation form and opined that the claimant did not have an impairment that met, medically equaled, or functionally equaled any of the Listings (Exhibit 5F).  Significant weight is given to this opinion as it is consistent with the evidence of record.

On March 5, 2007, Philip E. Comer, Ph.D., a reviewing psychologist at the state agency, completed a Childhood Disability Evaluation form and opined that the claimant did not have an impairment that met, medically equaled, or functionally equaled any of the Listings (Exhibit 6F). Significant weight is given to this opinion as it is consistent with the evidence of record.

On December 17, 2008, Dr. Kelley completed a Child Functional Assessment form and rated claimant as having marked limitations in the domain of attending and completing tasks.  Dr. Kelley further opined that the claimant had less marked limitation in the domains of acquiring and using information, interacting and relating with others, caring for self, and health and physical well-being.  Dr. Kelley also opined that the claimant had no limitation in the domain of moving about and manipulating objects (Exhibit 7F).  Great weight is given to [the] opinion of Dr. Kelley as it is consistent with the evidence of record.

(Tr. at 21-22.)

Regarding the ALJ's duty to refer a claimant for a consultative examination, 20 C.F.R. § 416.917 (2006) provides that

> [i]f your medical sources cannot or will not give us sufficient medical evidence about your impairment for us to determine whether you are disabled or blind, we may ask you to have one or more physical or mental examinations or tests.

In Cook v. Heckler, the Fourth Circuit noted that an ALJ has a "responsibility to help develop the evidence."  Cook v. Heckler, 783 F.2d 1168, 1173 (4th Cir. 1986).  The court stated that "[t]his

22

circuit has held that the ALJ has a duty to explore all relevant facts and inquire into the issues necessary for adequate development of the record, and cannot rely on evidence submitted by the claimant when that evidence is inadequate." Id. The court explained that the ALJ's failure to ask further questions and to demand the production of further evidence about the claimant's arthritis claim, in order to determine if it met the requirements in the listings of impairments, amounted to a neglect of his duty to develop the evidence. Id.

Nevertheless, it is Claimant's responsibility to prove to the Commissioner that he or she is disabled. 20 C.F.R. § 416.912(a) (2006). Thus, Claimant is responsible for providing medical evidence to the Commissioner showing that he or she has an impairment. Id. § 416.912(c). In Bowen v. Yuckert, the Supreme Court noted:

> The severity regulation does not change the settled allocation of burdens of proof in disability proceedings. It is true . . . that the Secretary bears the burden of proof at step five . . . [b]ut the Secretary is required to bear this burden only if the sequential evaluation process proceeds to the fifth step. The claimant first must bear the burden . . . of showing that . . . he has a medically severe impairment or combination of impairments . . . . If the process ends at step two, the burden of proof never shifts to the Secretary. . . . It is not unreasonable to require the claimant, who is in a better position to provide information about his own medical condition, to do so.

Bowen v. Yuckert, 482 U.S. 137, 146 n.5 (1987).

23

Although the ALJ has a duty to fully and fairly develop the record, he is not required to act as plaintiff's counsel. Clark v. Shalala, 28 F.3d 828, 830-31 (8th Cir. 1994). Claimant bears the burden of establishing a prima facie entitlement to benefits. See Hall v. Harris, 658 F.2d 260, 264-65 (4th Cir. 1981); 42 U.S.C.A. § 423(d)(5)(A)("An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as the Commissioner of Social Security may require.") Similarly, Claimant "bears the risk of non-persuasion." Seacrist v. Weinberger, 538 F.2d 1054, 1056 (4th Cir. 1976).

The court proposes that the presiding District Judge find that the ALJ properly evaluated the claim and was not delinquent in any duty to refer a claimant for a consultative examination per 20 C.F.R. § 416.917 (2006). It is noted that the regulation provides that an ALJ "may" ask for a physical or mental examination if there is not sufficient medical evidence about the impairment to determine whether a disability exists. Here, the ALJ did not err in finding there was sufficient medical evidence to determine that Claimant was not under a disability as defined in the Social Security Act. It is clear from the decision that the ALJ considered the entire record, including Claimant's testimony regarding his medical treatment, medications, activities of daily living, and school records. (Tr. at 12-22.)

As previously noted, it is Claimant's responsibility to prove

24

to the Commissioner that he or she is disabled.   20 C.F.R. §
416.912(a) (2006).   Thus, Claimant is responsible for providing
medical evidence to the Commissioner showing that he or she has an
impairment.   Id. § 416.912(c).   Claimant bears the burden of
establishing a prima facie entitlement to benefits.   It is not
unreasonable to require the claimant, who is in a better position
to provide information about his own medical condition, to do so.
Bowen v. Yuckert, 482 U.S. 137, 146 n.5 (1987).

Thus, the court proposes that the presiding District Judge
**FIND** that the ALJ did not err in failing to order a consultative
examination.

Consideration of Daily Activities and Medication

Claimant asserts that the ALJ's Decision is flawed in the
consideration of Claimant's activities of daily living [ADLs] and
medications:

> [T]he ALJ wrote her decision as if the claimant takes
> care of his dog, personal hygiene, and daily medication
> without any help, when this is far from the truth.  Ms.
> Shields, the claimant's guardian testified that she has
> to consistently remind the claimant to bathe and
> repeatedly ask in order to get him to do any of the
> chores.   The claimant testified that he plays video
> games, fishes, and rides his bike for fun.  The ALJ erred
> when she took these minor ADLs and used them to say that
> the claimant can therefore engage in work at all
> exertional levels...
>
> The claimant's treating psychiatrist has repeatedly
> changed the claimant's medicine because Mr. Boyce
> continually suffers side effects from the medicines.  The
> Adderall caused the claimant a great deal of difficulty
> sleeping, so Dr. Kelly prescribed a combination of
> Adderall and Strattera.  (Transcript pgs. 237-249).  His

25

> medicines were continuously adjusted, and it is not fair
> to state that just because the Doctor seems to have found
> a combination of medicines that do not cause him the same
> side effects, "that the claimant's ADHD is controlled
> with medication."

(Pl.'s Br. at 5.)

The Commissioner responds that the ALJ was entitled to consider this evidence in her evaluation of Plaintiff's subjective complaints per 20 C.F.R. § 416.929(c)(3)(i)(vii), which sets forth factors relevant to a claimant's symptoms, including daily activities:

> A claimant's daily activities is one of the factors that
> an ALJ considers in evaluating a claimant's allegations
> regarding his symptoms and limitations.  Here,
> Plaintiff's ability to care for his dog, as well as his
> ability to play video games, shows a level of attention
> and concentration that is relevant to his allegation of
> limitations in these areas...

> The ALJ was also permitted to consider Plaintiff's
> medication in her evaluation of Plaintiff's subjective
> complaints.  See 20 C.F.R. §416.929(c)(3)(i)(vii).  As
> the ALJ indicated, Dr. Kelly noted that Adderall was very
> helpful with Plaintiff's concentration (Tr. 235).  In
> addition, Plaintiff himself admitted that he was able to
> concentrate better when he took his medication (Tr. 38).
> This, too, is relevant to the ALJ's consideration of
> Plaintiff's level of functioning.

(Def.'s Br. at 15-16.)

Regarding Claimant's daily activities and medication issues, the ALJ stated:

> The claimant testified that he took his medication daily
> and that he could concentrate better with his medication.
> He admitted that he was hyper without his medication.
> Dr. Kelley adjusted the claimant's medications to help
> him concentrate better and improve his school grades.
> Dr. Kelley's records indicate that the claimant had

26

problems with side effects from the Adderall.  He can only tolerate a small amount of Adderall and had to take Strattera as well (Exhibit 7F)...

The claimant's attention deficit hyperactivity disorder is evaluated under Section 12.00 of the Listings.  With regard to the "B" criteria, the undersigned finds that the claimant has mild restrictions of activities of daily living (takes care of his own personal hygiene, takes his medication daily, and takes care of his pet dog); no difficulties in maintaining social functioning (he has friends that he hangs out with); moderate difficulties in maintaining concentration, persistence, or pace (has problems concentrating at school, he is able to concentrate to play video games); and no episodes of decompensation.

After careful consideration of the entire record, the undersigned finds that, since attaining age 18, the claimant has had the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: he could perform simple, routine, competitive, low stress, repetitive tasks on a sustained basis over a normal eight-hour workday with no more than simple decision making; he would be unable to perform complex and detailed tasks; he would require oral instructions; and he would have moderate limitation or occasional difficulty in maintaining attention and/or concentration for extended periods of two hour segments.

(Tr. at 18-19.)

With respect to Claimant's argument that the ALJ wrongfully considered Claimant's daily activities and medications, the court proposes that the presiding District Judge find that the ALJ properly weighed this evidence in keeping with the applicable regulations, case law, and Social Security Ruling ("SSR") and that his findings are supported by substantial evidence.  20 C.F.R. § 416.929 (2010); SSR 96-7p, 1996 WL 374186 (July 2, 1996); Craig v. Chater, 76 F.3d 585, 594 (4th Cir. 1996).

27

Although Claimant's representative may consider Claimant's ADLs to be "minor," the ALJ was entitled to consider this evidence in her evaluation of Plaintiff's subjective complaints and to reach her own conclusion regarding their impact on Claimant's ability to work. The ALJ fully explained her reasons for finding Claimant had the residual functional capacity to perform a full range of work at all exertional levels with nonexertional limitations. (Tr. at 19-21.) Further, the record shows Claimant's ADHD is controlled with medications. (Tr. at 229-36.) Claimant's treating psychiatrist, John Kelley, M.D., describes Claimant's condition as improved on medication (Id.) Also, Claimant testified that he took his medication every day and that he was able to concentrate better with the medication. (Tr. at 38.)

Thus, the court proposes that the presiding District Judge **FIND** that the ALJ did not err in her consideration of Claimant's daily activities and medication when determining Claimant's residual functional capacity to perform a full range of work at all exertional levels with nonexertional limitations.

Weight Given Opinion Evidence

Claimant further argues that the ALJ erred in failing to give proper weight to Claimant's teacher's opinion in a 2006 report. Specifically, Claimant asserts that

> [t]he ALJ committed reversible error in according little, if any weight to the opinion of the claimant's teacher as such opinions must be considered in determining how the claimant's impairment affects the ability to work, in

28

accordance with 20 C.F.R. §404.1513(d) and SSR 06-03p...

The regulations specifically provide that evidence from other sources, including teachers and schools, is used to "show the severity of your impairment(s) and how it affects your ability to work." 20 C.F.R. §404.1513(d)...

SSR 06-03p states, non medical sources who have had contact with the individual in their professional capacity, such as teachers...are also valuable sources of evidence for assessing impairment severity and functioning...

A child's teacher is absolutely more familiar with the child than a family doctor who may see the child once every six months or even once a year. The ALJ erred in not giving the teacher's report and school testing more weight.

(Pl.'s Br. at 5-7.)

The Commissioner responds that contrary to Claimant's assertion, the ALJ considered the October 9, 2006 report of Claimant's teacher when she evaluated Claimant's functioning according to the six domains and in her evaluation of Claimant's subjective complaints. (Def.'s Br. at 16-17.) Specifically, the Commissioner states:

[T]he ALJ considered the precise statement that Plaintiff relies on, namely, that testing revealed that he had deficits; and that he scored significantly below average in reading comprehension, written expression, and academic applications. (Tr. 20, 185). To the extent that Plaintiff suggests that his teacher's reports supports a finding of disability, he is mistaken. Although the report shows that Plaintiff has deficits, it also shows that his current classes were all regular education classes and that he was passing all except one (Tr. 185).

Plaintiff contends that the ALJ erred in not giving more weight to the teacher questionnaire from December 2006 indicating that he had "obvious problems" in certain areas of functioning in the domain of attending and

29

completing tasks (Tr. 138).   Plaintiff is mistaken in
this contention.  As discussed above, the ALJ considered
this report when she evaluated Plaintiff's functioning in
the domain of attending and completing tasks (Tr. 15).
In fact, the ALJ relied on this evidence in finding that
Plaintiff had a "marked" limitation in attending and
completing tasks (Tr. 15).

(Def.'s Br. at 17.)

The ALJ determined that before attaining age 18, Claimant did
not have an impairment or combination of impairments that
functionally equaled the listings (20 C.F.R. §§ 416.924(d) and
416.926a).   (Tr. at 13.)   In reaching this conclusion, the ALJ
analyzed the six domains of function, and extensively referred to
Claimant's academic records, including his teachers' reports.  (Tr.
at 13-18.)   Per 20 C.F.R. § 416.913(d), an ALJ is permitted to
consider evidence from "other sources" in addition to evidence from
the acceptable medical sources listed in paragraph (a) of the
section, in order to determine how a claimant's ability to work is
affected and if the claimant is a child, how a claimant typically
functions compared to children of the same age who do not have
impairments.   Educational personnel such as school teachers are
listed as acceptable other sources.   20 C.F.R. § 416.913(d)(2).

The ALJ considered and relied on the reports from Claimant's
teachers in concluding that Claimant had marked limitation in
attending and completing tasks before attaining age 18:

He had a short attention span.  He lost things easily,
became easily distracted, and was forgetful at times.  He
reportedly had problems sitting still, was fidgety, and
interrupted others in their conversations (Exhibit 2F).

30

School records indicate that the claimant was allowed
extended time for tests and class work.  An observation
report completed on October 24, 2005, revealed that the
claimant had a hard time staying on task (Exhibit 3F/15).
A teacher's report that same date revealed that the
claimant had a hard time finishing class work in a given
class period (Exhibit 3F/16).  However, an observation
report dated May 22, 2006, revealed the claimant came to
class prepared with his journal entries.  He stayed on
task and appeared to take in the day's lesson (Exhibit
3F).  The claimant's teacher reported that he had an
obvious problem paying attention when spoken to directly,
sustaining attention during play/sport activities,
carrying out multi-step instructions, completing
class/homework assignments, completing work accurately
without careless mistakes, working without distracting
self or other, and working at reasonable pace/finishing
on time.  The claimant has no problem in waiting to take
turns and only a slight problem in focusing long enough
to finish assigned activities or tasks, refocusing to
task when necessary, carrying out single step
instructions, changing from one activity to another
without being disruptive, and organizing own things or
school materials.  In fact, the claimant's teacher
reported that he had no serious or very serious problems
in this area of functioning (Exhibit 4E).

(Tr. at 15.)

Regarding Claimant's abilities regarding acquiring and using

information, attending and completing tasks, interacting and

relating to others, and moving about and manipulating objects, the

ALJ also extensively considered and relied on the reports from

Claimant's teachers to conclude that Claimant had less than marked

limitation in these areas.  (Tr. at 13-17.)

Thus, the court proposes that the presiding District Judge

**FIND** that the ALJ did not err in her consideration of Claimant's

teachers' opinions.

Substantial evidence supports the ALJ's finding that prior to

31

attaining age eighteen, Claimant did not have an impairment that resulted in marked and severe functional limitations and, therefore, he was not entitled to child's Supplemental Security Income, and that as of age eighteen, Claimant had the residual functional capacity to perform a range of unskilled work at all exertional levels that existed in the national economy, and therefore, as an adult, he was not disabled within the meaning of the Act.

For the reasons set forth above, it is hereby respectfully **RECOMMENDED** that the presiding District Judge **AFFIRM** the final decision of the Commissioner and **DISMISS** this matter from the court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable Thomas E. Johnston, District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have ten days (filing of objections) and then three days (mailing/service) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of de novo review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155 (1985); Wright v. Collins, 766 F.2d 841, 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir. 1984). Copies of such objections shall be served on opposing parties, Judge Johnston, and this Magistrate Judge.

The Clerk is directed to file this Proposed Findings and Recommendation and to transmit a copy of the same to counsel of record.

__November 23, 2010__
  Date

        _Mary E. Stanley_
        Mary E. Stanley
        United States Magistrate Judge